Good morning, Your Honor. May it please the Court, Adam Carter on behalf of the appellant plaintiff Arlene Fry. Let me go through the weight of the evidence, then the causation standard, and then quickly the comparator evidence. The question really is whether the jury could rely on this mountain of evidence that Ms. Rabbit did not make this decision to terminate Ms. Fry. The court, the district court, relies on a November 3rd email that's equivocal and then relies on my client's testimony about what was essentially a settlement discussion in late December after the FMLA leave. In distinction to retirement, she said, oh no, this was termination. I knew my job was going to be ending, as if to say. So that's what the district court uses as the hook to say, well, this was all a foregone conclusion. Well, the first point is that was after the FMLA leave taking. But let's go through this just mountain of evidence, if I may. Why would Linda Rabbit be pounding on the table, pounding on the table in front of three adults and saying to Mr. Haglin and Ms. Basilick and Ms. Fry, Arlene works for me. And makes them all, like school children, repeat it. Why this dramatic show? If she's already going to be terminated, then she's gone. Why do that? Why the vitriol in December about being on a cruise? Why the questions about, hey, how does this affect me and my life? Why do that if she's already made the decision? Why bother to negotiate with Ms. Fry? She tells her that she has to go on this leave. Why negotiate for seven more days to delay her leave taking so that Ms. Rabbit can be accommodated? Why pay Ms. Fry the biggest bonus ever? Why give Ms. Fry a raise that summer? Why no disciplinary paperwork between November 3rd and, well, indeed, never. There was no disciplinary paperwork. No paperwork drawn up until the termination February 3rd. Why deviate from policy regarding progressive discipline? This is classic evidence of pretext. Why did Rand wait until after my client gave notice of the leave taking, until after she actually went out on leave, to post this job blindly? And why post it blindly also? So that the employer's name is hidden. How come not one step was taken to terminate Ms. Fry until after her leave taking? The head of HR testified that the decision was made in February of 2017. So that's the weight of the evidence. I can move to the causation standard, if Your Honors please. I wasn't sure whether to do this as a 28-J or not. I did, in preparation for oral argument, notice that there are several district court decisions that have come down since the briefing was completed. None of them take the position that the employer would take here on the causation standard. And, indeed, one court from the Northern District of Illinois, and, again, I'm happy to put this in a 28-J letter after today, but a case called Hayworth v. Round Lake area, the Northern District of Illinois, says, quotes Woods and cites to Woods, saying that the court sees little textual reason to apply Nassar to a 2615A1 retaliation claim. Making the point that, and I know this is dense. Since you start there, so Woods and the cases that you cite, including the regulation in the Department of Labor, all address scenarios or instances where the decision maker believes that a retaliation for exercise claim arises under A1. Yes. And your colleagues talk about this in their brief. And I can read those, and those make sense, and you understand it. The problem you've got is that the Fourth Circuit in four or five different decisions has said we disagree with that, that, instead, a retaliation for exercise claim falls under A2. And right, wrong, or indifferent, you know, we are bound by our prior precedent saying that retaliation for exercise claims, starting with Yashinko, are A2 claims. And so what I'm having trouble understanding is how to apply all of this A1 analysis, which I can understand if it's an A1 claim, given that we begin with the premise that at least in the Fourth Circuit, as it currently stands, your claim is an A2 claim. It's not, though. It's an A1 claim. It's mostly Then explain to me why, when Yashinko says a retaliation for exercise claim arises under A2, tell me why we should, how, as a panel, we can ignore that. Well, it's not that, first of all, the facts of Yashinko are more A2-ish. There's more opposition, and it's not the mere leave-taking as there is in this case. Now, I grant you, this case doesn't fit neatly A1, A2, but it's mostly A1. She is, especially if you look at what the district court is saying, moving the timeline back to closer to her leave-taking. But we say in all these cases, and maybe you just want to say those cases are wrong, and that may or may not be right, but they are the cases that say if you're fired because you take leave, right, a retaliation for exercise claim, that cases like Woods put as an A1 claim, the Fourth Circuit has put them as an A2 claim. And right, wrong, or indifferent, if, let me maybe change this to a hypothetical, if that is true, how does that affect your argument? Because that means Woods and that line of cases are inapplicable. The regulation is inapplicable, and so we're in an A2 world. Does that sort of resolve your claim? No, again, if we're in an A2 world, that's because somebody has opposed or stuck their neck out. So now you're fighting my hypothetical. I'm sorry to do that, sir. No, no, but I don't want you to fight that. Maybe the answer is you have to fight the hypothetical or you lose, and that's fine too. But if a retaliation for exercise claim arises under A2, if it arises under A2, then do you agree that it is but for a causation and the Woods line of cases and the regulations don't apply? I'm sure, I don't know how to answer that because I only think that retaliation for exercise is under A1. Number one, you're not asking the hypothetical. Number two, there are some powerful arguments that it should be A2. Interference is either preceding or contemporaneous with the conduct, whereas retaliation is in response to conduct. Yes. And so staying away from that argument for a moment, Judge Richardson's hypothetical is if we have held that retaliation falls under A2, then it seems to me the district court was correct. Well, the thing is we're talking about what kind of retaliation it is. Well, it's not in the statute at all. We can all agree that the statute is not a model of retaliation. Retaliation by definition is in response to conduct, so it's post-conduct. Yes, sir. Okay. Whereas interference is preceding or contemporaneous with conduct. And this is why I analogize, Your Honor, to a race case where it's status versus I'm complaining about you discriminating against me because of my race. Somebody doing something to stick out their neck. So this is status-based. And I believe that Woods and Egan have it right that when you are merely taking the leave, that that is the way that an employer who is going to interfere the best is going to take an employee out for taking the leave. That's why it's rooted in A1. If the employer denies the leave or cuts it short, the employer is interfering. We're all in agreement with that. If the leave is taken and then the employer takes action, that is retaliation because the person took leave, right? I believe that that is an interference with the- It can't be interference because you can only interfere before or during the conduct. You can't interfere after the conduct. The conduct is done. You can retaliate for the leave-taking, which is rooted in A1 because she hasn't opposed anything. She hasn't done anything to oppose. And that's what's in A2. And so- And that I agree- Your argument is the retaliation here is because she took leave, not because she opposed. Correct. That's right. And the question is where does that fall? But getting back to Judge Richardson's question, I still haven't heard a response from you. I sort of interpreted it. But if we are under A2 under our cases, what's the logical consequence in this case? Well, again, I don't think we're under A2. I think we're under- But I'll go with it. I'll go with it. You've got to.  I understand. Your Honor, I'm about to answer. I think that if we are under A2, then we are, I agree, we are then under but-for, and that's why I started with the weight of the evidence that it is what a jury, and what I think this Court should decide, is that the jury heard all of this, weighed all of this- So the jury heard, was instructed but-for. That was what's applied. And then the question is was there sufficient evidence or not? That's right. And it was- But-for standard. That's right, and it was plenty- So it doesn't make any difference what standard we apply in this case, is that correct? I agree that- Well, then, but see, I have to say, you put us down this path, spent pages and pages talking about the standard. If it doesn't make any difference to you- No, it does make a difference. It certainly makes- So in this case, to the result in this case, does it make a difference? I believe that we have enough evidence to satisfy either standard. It would have been a slam dunk if we'd had the lower standard, and I believe it was legal error for the judge under Woods and Egan to make any other decision with respect to the causation standard. Quickly on comparator evidence. But if it was, just hypothetically, if we found that it was the negative factor, wouldn't we be, maybe not compelled, but wouldn't we then remand to the district court to apply the appropriate standard for determining? Yes. Right. And so just help me understand why it doesn't matter. Your point is we could just go ahead and reach that decision ourselves. Yes. And then quickly, I thought it was a little, for the district court to say, you don't have enough evidence, but then he took away our best comparator of Ms. Rabbit's predecessor, who was also taking medical leave, although not FMLA leave, and was terminated. And if only to be able to use that to impeach Ms. Rabbit, who said that that woman, Ms. Boyle, had resigned when, in fact, she was terminated. I'll reserve on the rest of my time. Thank you. Thank you, Mr. Carter. Mr. Tiske. Thank you, Your Honor. May it please the court, James Tiske on behalf of RAND Construction. The outcome of this appeal is dictated by two common sense legal principles. First, an employer cannot be held liable for FMLA retaliation if it makes the termination decision before the employee engages in the protected activity. And second, an employer who decides to terminate an employee for lawful reasons need not change course when the employee then requests to leave. Here, as the district court properly noted, the uncontradicted evidence revealed that RAND had decided to terminate the plaintiff by November 2016, weeks before she requested leave, such that retaliation could have played no role in her termination decision as a matter of law. Now, the plaintiff concedes that by early November, her boss had grown, Linda Rabbit, had grown chronically unhappy with her and was, in fact, no longer speaking to her in the wake of several mistakes that plaintiff herself testified were, quote, serious. And, in fact, it was only after plaintiff had already printed and read a private email from her boss expressing the desire to, quote, replace her, that the plaintiff decided for the first time to tell RAND about her disability and request FMLA leave. Given those facts, it was not reasonable for a jury to infer that RAND engaged in unlawful retaliation. What I mean by that is that all of those are, you know, sort of predictive type statements. I want to replace her. Like, I don't like her. She's not doing her job. But I don't see anything in those communications that say, or from which, frankly, I can infer, that the decision has actually been made to terminate her. I totally understand that there's a lot of evidence that she didn't like her, that she was upset, that she was disappointed, that she, in some sense, would like to fire her. But there's no, or at least I can't find in the record where there's evidence that she actually made the decision or the company made the decision to fire her prior to being informed of her illness. Thanks, Your Honor. I think there is that evidence, Your Honor, and I can point you to a number of places where I think. Give me the best thing you've got. Well, I think the best thing is the November 3rd email, Your Honor. And what that email specifically says is that J.A. Where are you in the J.A.? It's at J.A. 1264. And this is an email. So the context of this email is she's sent an email to Arlene Frey saying, if she blew this, or she says, if you blew this, I'm going to be really, really, really angry with you. Then moments later, she sends an email to her COO, Kurt Hagelin. What that email says is, this is what I was working on with JLL. Timing is critical, and I think Arlene blew it. If she did, I need to replace her. I need to replace her. Not I might need to replace her. Maybe I'll replace her later. It's conditional in the sense of, if she blew it, I need to replace her. But it's clearly saying. But she said those things before. I mean, there have been some pretty strong statements before, and she never followed through with it. Indeed, there are some strong statements after. And it seems that they don't follow through with it until, if any time, late December. And even then, it's sort of like, well, we're going to still spread it out over some time. I mean, that seems like a – and, again, we've got to look at this not through the view of like, what do I think the best answer is, but instead, what would a reasonable jury be permitted to conclude? And from reading that, it's hard for me to find how you get to a jury could only conclude that the decision had been made. I think Judge Richardson's put his finger on exactly the problem in your case. If I was on this jury, I would probably not have done what the jury did. But I wasn't on this jury, and neither was the district court. And it seemed to me that the district court didn't recognize what a reasonable jury might have thought about this evidence. Well, I appreciate your question. And that's his role. He can't be retrying the case and telling us what he thinks. To be sure, Your Honor. But at the same time, the question is ultimately what a reasonable jury would do. What are the reasonable inferences here? And I think in many cases, the Reeves case, for example, makes clear that notwithstanding the fact that there might be some weak evidence on one side, I'll quote from the Reeves Supreme Court decision. It says, the judgment as a matter of law may be available where, for example, a plaintiff has created only a weak issue of fact as to whether the employer's reasons were untrue, and there was abundant and uncontroverted – about whether we know that ultimately they wanted her fired. The question is when. And so it strikes me that that's a little different. Reeves doesn't really speak to that. Fair enough, Your Honor. But I think that Reeves also says that you do look at the entire record to the extent it's uncontradicted and unimpeached. And going back to Judge Richardson's question, the question here is, what could a reasonable jury have inferred was the termination date? And you mentioned that there were. I think I understand your argument there. I'm not saying I agree with it, but I understand the argument. Tell me about what I understand to be the second argument, that even if the decision is not made until December, like after she returns, that a reasonable jury could not conclude that the but-for reason for firing her, given all of these problems that existed, that the but-for reason – it may even have been, there may have been sufficient evidence to say it's a contributing factor, but that it wasn't the but-for cause. The FMLA leave was not the but-for cause, given the extensive problems and background and the almost firing, except that as a hypothetical, the almost firing before November that is fully carried out in December, that a reasonable jury could not conclude that her taking those two weeks of FMLA leave were the but-for cause. I think you need to look at it in terms of the entire record. So it includes all the information I already cited about how the November 3rd email says I need to replace her. There was the pro and con list that was around the same time that the boss left on the human resource director's desk with two pros and a bunch of cons, which everyone testified consistently meant that she was going to get fired. There was evidence in the record, uncontradicted and unimpeached, that there was a meeting that afternoon with the relevant decision makers. Fry testified she didn't know what it was about. She herself also testified that she went to both Kurt Haglund and the human resources director with concerns about whether or not that email that she read that was private indicated that she was going to be replaced. Then we look at the context. She screwed up again a couple weeks later, took a few days off. The day she came back, she announced she was taking FMLA leave. About a month later is when they sat down with her and informed her that they were going to voluntarily or they were going to separate her from her employment within six months. So this is a compressed time frame. It's true that the FMLA leave took place in that time frame, but it's not a long period of time between when the decision was made and when it was given to her. But the problem is you keep telling us to look at the entire record. Good for you. We should be doing that. But they have a long and rocky history together. There are prior threats. There are prior unhappiness. I mean, it seems like an extremely difficult, challenging workplace. Maybe high pressure, but in any event, it looks to me like in this record there are a lot of instances where there was extreme unhappiness with the plaintiff and suggestions that you've got to do better, that I'm terribly disappointed with you, you're going to leave, you're not going to do blah, blah, blah. So how are we to know? And then don't we have from some witness saying that this was the last straw? There was that statement, Your Honor. But I think if you actually look at that piece of evidence, he's referring to the last straw in February saying we were no longer going to offer her the six-month separation date. The last straw comment was made in February in reference to her actual termination date, not the termination decision. So I don't think that statement bears on this. But to your point, I do think the November 3rd incident was different in kind, Your Honor. I think this is why I believe that email that I read earlier is so critical, because unlike these prior circumstances where Rabbit expressed her frustration directly to the employee, to Fry, and said things like, I'm very concerned about your performance, you're embarrassing me, your job might be in jeopardy. This time she said, I'm so angry, and then went to her COO, Kurt Hagelin, privately, where she had no incentive to hide or dissemble or pull any punches. And she said, I need to replace her based on this incident. So that's why I think that private email is – Is that the first time that Rabbit goes to the COO? As far as I know, that is the only evidence in the record. And at the same time, Rabbit prepared a list of pros and cons, which was her presentation. Correct. Correct, Your Honor. In essence, what we can do – as I'm hearing you, what you're in essence saying, you begin your argument by saying this evidence indicates that she was effectively fired before November. You also are arguing, you take that same evidence to show that her poor performance was at least a significant, even if not the only factor that went into firing her, hence as sort of an alternative argument for you, she doesn't meet the but-for standard, though she might, you know, if the appropriate standard were a negative factor, you would face a much harder argument, I presume you can see. Well, I don't think it would be much harder, Your Honor, because the way we understand the negative factor, motivating factor to work, is the ultimate question is still whether or not this decision ended up being the determinative one. Because even in a situation where a plaintiff has shown under Price Waterhouse that there was a motivating factor that led to the decision, in that case, the defendant still is able to prove that they would have made the same decision regardless. So ultimately, I think it's more – it goes to more of the burden shifting rather than the actual – the ultimate standard. So I don't think that – so – Put that aside and go back to that earlier. Right. So – but, well, the point I was going to make, and if it's not the same one, feel free to correct me, but I do think that, yes, the way you described it is correct in terms of the alternative arguments. I don't think a reasonable jury could have concluded anything other than the fact that she was – her termination was inevitable as of early November. And that's because of the buildup where – to November 3rd where you get that different in-kind response. I mean, that Fry was saying that she was not talking to her any longer, that she was purple with rage, she was too angry to speak. I mean, I just think that sort of evidence goes to both points. And then with respect to the alternative argument that, you know, regardless of whether or not the decision was technically made in November, you still have to look at the overall record, and that goes to the response I gave Judge Motz earlier, which is that the Reeves case says that even where a plaintiff presents evidence that an employer's reasons were untrue, and there was – that still might lead to a JMAL where there was nevertheless abundant and uncontroverted independent evidence that no discrimination had occurred, and we think that's an equally valid way to resolve this case. Now, going to your motivating factor question, Your Honor, I think that the standard is a little bit of a red herring here because they – the plaintiff admitted that she had no direct evidence of retaliatory animus in this case and therefore was proceeding under the McDonnell-Douglas pretext standard. And in that circumstance, I think this Court is very clear that where a plaintiff does not have direct evidence, they must proceed under the pretext framework. That's what the Wag case says. That's what the Vinoy case says that we cite, the Sharif case. You can proceed either under direct evidence or the McDonnell-Douglas framework. And then under the pretext framework, I think the cases are equally clear that the standard under pretext is but for, not motivating factor. We certainly have said that in the Title VII context, that the pretext step of McDonnell-Douglas is equivalent to but for causation. The question is whether that ought to be true. I mean, we're like a couple levels down the ifs here, but if negative factor, motivating factor, contributing factor, whatever phrase you want to use were found to be the appropriate standard under A-1, and if this was an A-1 case, then the question is should McDonnell-Douglas, should the last step of McDonnell-Douglas be pretext, or in that narrow context, should the last step of McDonnell-Douglas be non-contributing factor, right, sort of the proof of the negative? Well, I don't think you need to get there in this case, Your Honor, because for multiple reasons. One, I think we went under the first argument in our brief, but also for the reasons I just mentioned, they don't say they had direct evidence in this case for proceeding under McDonnell-Douglas. I think the Foster case answers that question. It says that's a Title VII case, but it says that in all the stages you need to show the real reason, but I think that's what the Lange case said as well. It's a 2013 case from the circuit Lange v. FedEx. It uses the phrase real reason. Was the FMLA retaliation the real reason? I agree with you. In the Title VII context, even where contributing factor is the appropriate causation standard, our court has continued to apply pretext under McDonnell-Douglas. I'm not sure why that is, but assuming that that is true, we need not do that necessarily in the FMLA context. What I'm saying is the Lange case was an FMLA retaliation case, and it used the phrase real reason. But that's because it didn't say that it was a contributing factor was the appropriate causation standard. It did. It cited the DLL regulation and said an employer may not use this as a negative factor, and then it goes through the McDonnell-Douglas framework, and it says ultimately the plaintiff failed to show that it was the real reason in that case. I think Lange directly supports the argument here that under the pretext back-and-forth framework, it's still a but-for. And if I can point you to something else, which I think really drives this point home, I do think there's some doubt after Nassar whether you ever can get a mixed motive or a negative factor or motivating factor standard in a case like this that involves a plaintiff who's trying to proceed under FMLA retaliation, which is patterned after Title VII retaliation. But going to the Third Circuit case that plaintiff relies on primarily, which is this Egan case, in footnote one of that decision, that case says a plaintiff who proceeds to trial under a pretext theory, distinguishing it from a mixed motive theory, must prove that the exercise of a protected right was a determinative factor and therefore had a determinative effect on the decision, such that in the absence of the protected conduct, the adverse employment action would not have occurred. So even their best case, their Egan case, makes very clear that if an employee nevertheless elects to proceed under the pretext framework, they still have to show that it's a determinative factor. And I can point you to... The theory there, from your perspective, is that the McDonnell-Douglas test, by definition, whatever the ultimate causation standard, if you're using that methodology, pretext means but-for causation. So that has to be the last step. And that's right, Your Honor. And if you look at the jury instructions from the Third Circuit, they look at that. Again, my colleague in the other side cites. They cite the 10.12 in the Third Circuit pattern jury instructions. It's called discrimination mixed motive. If you look a few pages later, and that does note motivating factor as the standard. But if you look to the next instruction, it's elements of an FMLA claim discrimination pretext model. And that uses the determinative factor. So again, I think even under their best case, it's still but-for if you're under a pretext framework. So I don't think you actually need to reach that conclusion. In this case, I think because they've conceded, there's no direct evidence. We are in a position where we're under pretext. You could save for another day whether or not motivating factor might hypothetically be available in a FMLA retaliation case, notwithstanding Nassar and all the others. I'm happy to answer any other questions the court has about anything in any specific questions. I will say that with respect to the comparator evidence, there's no abuse of discretion here. The court looked carefully on the record, walked through the factors that the Fourth Circuit encourages judges to look at, and it's a balance under 403. I think my colleague on their side has made no argument with respect to 404 character evidence and therefore has essentially abandoned the argument that this would be impermissible character evidence. If there's no further questions, I'm happy to address them. Thank you, Mr. Tice. Mr. Carter. Thank you. Thank you, Your Honor. Just on Lange quickly, that case did not address the FMLA causation standard. It wasn't addressed and it wasn't decided. Your Honor. It did cite to the regulation that you're relying upon and use the reference to a motivating factor, right? It did. It did not, but it didn't decide this question. Judge Motz's decision or opinion, rather, in Yashchenko does note that the court should give Chevron deference to the DOL in the regulations but is addressing a different reg of the FMLA. And so, again, when Your Honor raised Yashchenko before, I was thinking that it just wasn't quite on point. It is a retaliation claim. It's not the Chevron deference part of Yashchenko. Yashchenko says that if you're retaliated against for taking leave, the claim arises under A2. That's the language of Yashchenko. I'm paraphrasing, obviously. I'm not quoting it. And so that's the part, which has been repeated in WAG and a number of other cases later on. But that language, not some Chevron deference, seems to me to be the controlling law in this circuit. I just think that the Woods and Egan are a more refined analysis of the statute than Yashchenko. You may be right on the merits as the first principles, but we're a panel and we're bound by the prior panel. I appreciate the point. With respect to Your Honor's recognition of the straw that broke the camel's back, it was Hagelin's deposition where my colleague asked the question, was this, the e-mail that she wrote on February 2nd, the straw that broke the camel's back, to which he said, yes, it was. And so the evidence is when we're talking about but-for causation, this is Justice Scalia in Burridge. It's a criminal case, but nevertheless tells us what but-for means, that it means the straw that broke the camel's back. Another analogy that works for me is in a three-strikes-you're-out system, we presuppose that there are other strikes. And Your Honor is right. This was a contentious relationship. It was an eight-year relationship. She'd never been disciplined before. But it's not an accumulative cause issue. It is a multiple cause issue. And but-for addresses which cause is operative, which is different from what you're analogizing and arguing. I'm making the point, though, that when you have a three-strikes-you're-out system, you're only out on the third strike. You're not out on the first or second strike. I know, but that isn't analogous to a but-for. Yes, it is. But-for is multiple causes existing at the same time and selecting the particular cause as determinant. It is-if you look at what Justice Scalia said, and it's not my analogy, it's his, that it is the straw that broke the camel's back presupposes there's other straw. Well, at the point the decision's made, not three strikes, but at the point in time the decision's made, the straw that contributes to the determination is the operative cause. And if you don't have that last piece of straw, the camel's back doesn't break. And the same thing with a third strike. If you don't have the third strike, you're not out. And so the point I'm making is that Ms. We have the jury being able to rely on the HR director saying that the decision was made then. We've got Mr. Hagelin saying the decision was made then. And for the district judge to say, oh, no, no, the decision was made earlier to terminate. Why? Based on my client's testimony that they had in mind that they were going to terminate her. And this is very important. They wanted her to train her replacement. If she's so awful, why do they want her to train the replacement? They know that the relationship is- That goes just the other way. If you decide to terminate somebody and you say, I'm terminating you, but I'd like you to help train my replacement, that determines the fact that you're going to have a replacement. What it said, though, was it said that we are going to be terminating you into the future. We're going to terminate you six months hence. And we want you to, once we find this replacement, we want you to train them. I didn't see any evidence of anything redemptive about her continuing employment after November, I must say. I'm hearing the arguments today. The relationship between Rabbit and your client was broken. And this is the first time that Rabbit went to the COO and she made out a list to make her case. The pros and cons to the COO. This person needs to be replaced. I don't think that relationship existed anymore at that point. Well, Rabbit is the CSO. She's the CEO. She's the whole company. Yes, she is. And she's the owner. And the evidence is that this is her decision. But the other point is that there was no paperwork was undertaken to actually terminate her. Nothing until she actually gave FMLA leave notice was any action taken. This is the absence of evidence that could be there. But the question is, when was the employment terminated? And the question is, did the employment continue effectively at anything in any semblance after November 3rd? And the HR director testified and the jury was able to rely on the decision being made on February 3rd. That is what the testimony was. That's what the jury was able to rely on. Let me ask you this, just a little bit of a change. In view of that evidence, and you argue with a little different emphasis on it, and that's fair. But how can a jury operate on a pretext, in a pretext case, to say that the relationship between Rabbit, as it developed between Rabbit and Fry, was not broken at that time and was not the real reason? In other words, the idea that she was not performing seems to me, undisputably, was not a pretext. It seems to me it was at a stage where it was, at best for you, was falling apart. And so under that, how could you satisfy a pretext standard? Your Honor, I notice I'm out of time. You presented it as a pretext case. Yeah, go ahead. I'm out of time. I want to answer your question. Your Honor, pretext just simply means lie. And so what we know is that Ms. Rabbit isn't being truthful when she's, or Rand, is not being truthful when they say that they made the decision on November 3rd. They didn't. They took no steps to actually terminate her on November 3rd. And importantly, we know that the… Actually, they took steps that's indicative of that. They were looking for the possibility of placing her somewhere else, putting her on part-time. All after her FMLA. Well… All after her FMLA. Very important. All after November 3rd. No. All after the FMLA leave-taking. After November 3rd. Just on this point, very quickly. There is no efforts taken to terminate her, and the advertisement and all of that was all after she gave the leave. And it was only in response to her asking, hey, I've seen this email. What's happening? And Hagland, the COO, says, no, no, no. She's just angry. She's going to cool down. And very importantly, they never talked about it. And very importantly, my client was not at fault for the November 3rd screw-up. That never was resolved to that point. Can I ask you a question before you sit down? I know your time is just about up. What did you ask for damages? I know what you got here. What had you requested? I couldn't find it anywhere. We got 55K. I know what you got. Yes, ma'am. It was more than that. But the reason was because of the after… You had a couple of claims. So what was the total ask? The jury found against you on two counts, right? There was an ADA claim, that's right, that didn't win, and I'm blanking on the other. Did you try the case? I was not the trial lawyer on it. Talk to the trial lawyer. Yes, yes. But, Your Honor, the answer is the total damages, as I recall, was north of $250,000. The issue, the reason why those damages were circumscribed was because the jury did find that there was an after-acquired evidence defense that the defense was successful, and we've not appealed that. But they said they didn't adjust the damages based on that. Right. I mean, the jury said they didn't adjust the damages based on that, and they adjusted it on something else, right? That's why I thought maybe you asked for more damages. We just don't know about what you asked for damages, and I just thought you might know. I apologize. I didn't have that one. Thank you, Mr. Tice. We'll come down to Greek Council and proceed on to the next case.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Julius N. Richardson